NO. 11-2157_____

# In The
# United States Court of Appeals
### For The Fourth Circuit

Office of Strategic Services, Inc.
On behalf of U.S. Smoke & Fire Curtain, LLC.,

Plaintiff-Appellant

v.

Steve Sadeghian; U.S. Smoke & Fire Services, LLC.;
CYSA Development Management Corporation,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  EASTERN DISTICT OF VIRGINIA                AT ALEXANDRIA

Opening Brief For Appellant OSS, Inc.

on behalf of US Smoke & Fire Curtain, LLC

Terrance G. Reed
Robert K. Moir
Lankford & Reed, PLLC
120 N. St. Asaph St.
Alexandria, VA  22314
(ph) 703-299-5000

Counsel for Appellant

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, U.S. Smoke & Fire Curtain, LLC, *Plaintiff/Appellant,* certifies as follows:

U.S. Smoke & Fire Curtain, LLC is a Virginia Limited Liability Company, owned by its two members, CYSA Development Management Corp. and Office of Strategic Services, Inc.  No parent company or publicly held corporation owns any stock in U.S. Smoke & Fire Curtain, LLC.

Office of Strategic Services, Inc. is a Virginia corporation with no parent company and no publicly owned shares.

**TABLE OF CONTENTS**

Table of Contents…………………………………………………………...………i

Table of Authorities……………………………………………………..…………iv

Jurisdictional Statement………………………………………………………….1

Statement of the Issues………………………………………………………..1

Statement of the Case……………………………………………………....…..2

Proceedings Below…………………………………………………...…………….2

The Memorandum Opinion………………………………………………….……..5

Statement of Facts…………………………………………………...…………..7

Material Disputed Facts on Summary Judgment………………………...…………8

    A.    The Promotion of a Joint Venture………………………………….8

    B.    The Curtain Joint Venture Becomes
            U.S. Smoke & Fire Curtain, LLC…………………………....…..8

    C.    While Curtain's CEO, Sadeghian Creates a New Entity,
            Services, and Starts Competing with Curtain for the Opportunity
            to Sell the Same Products from the Same Source……………..……14

    D.    Curtain Creates Trademarks for the Sale of Smoke and
            Fire Curtains, Which Are Then Infringed Upon by Defendants……20

Summary of Argument………………………………………………...……..21

i

Argument................................................................................22

Standards of Review.............................................…..............................22

The District Court Erred in Granting Summary Judgment...............…....24

A.   The District Court Erred by Failing to Exclude, and
     by Relying Upon, Defendants' Parol Evidence
     Contradicting the COA and CDA....................….….................25

B.   The District Court Erred in Not Striking and Relying Upon
     Unauthenticated Documents Containing Parol Evidence to Grant
     Summary Judgment.......................................................33

C.   The District Court Erred in Failing to Address Defendant
     Sadeghian's Fiduciary Duties to Plaintiff..................….....….......35

D.   BLE Products, and Smoke and Fire Curtains, Are Business
     Opportunities of Plaintiff U.S. Smoke and Fire Curtain, LLC…....…39

E.   Defendants Did Not Disclose to Plaintiff, Nor Obtain its
     Consent for the Business Opportunity for BLE Products
     They Took For Themselves.................................….…........…..42

F.   Plaintiff is Capable of Selling Smoke and Fire Curtains…...….........44

G.   The CDA Secures BLE Product Opportunities for Curtain,
     And Even if It Did Not, Sadeghian Breached His Fiduciary
     Duties to Curtain by Allegedly Negotiating a Better Distribution
     Agreement for Himself.................................................…...46

H.   The District Court Erred in Failing to Credit Plaintiff's Evidence....54

I.   The District Court Erred in Invalidating Plaintiff's Intellectual
     Property Rights...............................................….......….56

     1.   Curtain Has A Valid Registered
          Elevator Shield Trademark....................…............…......57

     2.   Curtain Has Standing To Claim Its Marks...........….........…59

3.    Curtain's Trademark Application for Its Name
Was Not Merely Descriptive………………………..…….61

E.    In Any Event, the District Court Erred in Granting Summary
Judgment When It Found that the Moving Party Had an Actual
Unwaivable Conflict of Interest……………..………....………..61

CONCLUSION………………………………………….………………………..63

# TABLE OF AUTHORITIES

**Cases:**

*Abington Pediatrics, P.C. v. Carter*, 2002 WL 485038
(W.D. Va. March 25, 2002)……………………………………………23

*Adams v. Seymour*, 191 Va. 372, 61 S.E.2d 23 (1950)…………………………13, 32

*American Health Ins. v. Newcomb*, 197 Va. 836, 91 S.E.2d 447 (1956)…..……..51

*American Online Latino v. AOL, Inc.*,
250 F. Supp.2d 351 (S.D.N.Y. 2003)……………………………..……..60

*Amos v. Coffey*, 228 Va. 88, 320 S.E.2d 335 (1984)…………………………27, 33

*Anden Grp., v. Leesburg Joint Venture*,
237 Va. 453, 377 S.E.2d 452 (1989)………………………………..……33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………23

*AOL, Inc. v. AT&T Corp.*, 243 F.3d 812 (4th Cir. 2001)…………………………..57

*Arent v. Bray*, 371 F.2d 571 (4th Cir. 1967)………………………….…………....43

*Berry v. Klinger*, 225 Va. 201, 300 S.E.2d 792 (1984)………………………28, 51

*Bonds v. Leavitt*, 629 F.3d 369 (4th Cir.),
*cert denied*, 132 S. Ct. 398 (2011)………………………………..……..……8

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d. 514 (4th Cir. 2003)……………………………………..………..23

*Bridgestone/Firestone, Inc. v. Prince William Square Associates*,
250 Va. 402, 463 S.E.2d 661 (1995)………………………………...……..52

*BS Sun Shipping v. Citgo Petroleum Corp.*,
509 F.Supp.2d 334 (S.D.N.Y. 2007)…………………………………….34

*Burruss v. Green Auction*, 228 Va. 11, 319 S.E.2d 725 (1984)………………43, 44

iv

*Carl Call Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir. 1977)................................32

*Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp.2d 697 (E.D. Va. 2006)...........23

*Chartbrook Ltd v. Persimmon Homes, Ltd.*, 2009 UKHL 38 (2009)............30, 52

*Choice Hotels Int'l v. BSR Tropicana Resort*,
    252 F.3d 707 (4th Cir. 2001)...............................................................23

*Coal River Collieries v. Eureka Coal*, 144 Va. 263, 132 S.E. 337 (1926)......27, 31

*Crump v. Bronson*, 168 Va. 528, 191 S.E. 663 (1937)..................................58

*Demoulas v. Demoulas Super Mkt, Inc.*,
    424 Mass. 501, 677 N.E.2d 159 (1997)..................................40, 47

*Dixon v. S & S Loan Service*, 754 F. Supp.1567 (S.D. Ga. 1990)..................24

*Erlich v. Hendrick Const. Co.*, 217 Va. 108, 225 S.E.2d 665 (1976)...........13, 27

*Feddeman & Co. v. Langan Assocs.*, 260 Va. 35, 530 S.E.2d 668 (2001)..........37

*Forrest Creek Associates, Ltd. v. McLean S&L Ass'n*,
    831 F.2d 1238 (4th Cir. 1987)...............................................................27

*Food Lion, Inc. v. Nusbaum Ins. Agency*,
    202 F.3d 223 (4th Cir. 2000)...............................................................58

*Fransmart LLC v. Freshii Development, LLC.*,
    768 F.Supp.2d 851 (E.D. Va. 2011).........................................................32

*Foremost Guaranty Corp. v. Meritor Sav. Bank*,
    910 F.2d 118 (4th Cir. 1990).................................................................31

*Globe Co. v. Bank of Boston*, 205 Va. 841, 140 S.E.2d 629 (1965).............27

*Grubb v. Grubb*, 272 Va. 45, 630 S.E.2d 746 (2006)........................22, 23

*Guiletti v. Guiletti*, 65 Conn. App. 813, 784 A.2d 905 (Conn. App.),
    *cert. denied*, 258 Conn. 946 (2001)..................................................39

*Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (Del.1939)...........................47

*Hicks v. Star Imports, Inc.*,
　　5 Fed. Appx.  222 (4th Cir. March 7, 2001).....................................24

*Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999)........53

*Hughes & Co. v. Robinson Corp.*, 211 Va. 4, 175 S.E.2d 413 (1970)...............51

*In re Access Cardiosystems, Inc.*, 340 B.R. 127 (Bkr. D. Mass. 2006)......46, 47, 56

*In re Demert & Dougherty, Inc.*,
　　271 B.R. 821 (Bkr. N.D. Ill. 2001)..........................................45

*In re French*, 499 F.3d 345 (4th Cir. 2007).......................................22, 54

*In re McMahon*, 236 B.R. 295 (S.D.N.Y. 1999)...............................52, 53

*In re Trim-Lean Meat Products*, 4 B.R. 243 (Bkr. Del. 1980).......................45

*Island Software and Co. Service v. Microsoft*, 413 F.3d 257 (2d Cir. 2005)........61

*Johnson v. Washington*, 559 F.3d 238 (4th Cir. 2009)..............................32

*Lamson & Sessions Co. v. Mundinger*,
　　2009 WL 1183217 (N.D. Ohio May 1, 2009)................................62

*Langman v. Alumni Ass'n of Univ. of Virginia*,
　　247 Va. 491, 442 S.E.2d 669 (1994)......................................28

*Marcuse v. Board-Grace Arcade Corp.*, 164 Va. 553, 180 S.E. 327 (1935)........58

*Martin Marietta Corp. v. Fireman's Fund, Inc.*,
　　852 F.2d 566 (4th Cir. July 22, 1988)....................................27

*McCain, Inc. v. Arlington County*, 249 Va. 131, 453 S.E.2d 659 (1995)...........23

*Medline Indus., Inc. v. Maersk Medical Ltd.*,
　　2004 WL 422718 (N.D. Ill. Feb. 24, 2004)..............................30, 33

*Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928)...........................43

*Money Point Diamond Corp. v. Union Corp.*,
    998 F.2d 1009 (4th Cir. July 23, 1999)………………………….………33

*Montague Mfg. Co. v. Homes Corp.*, 142 Va. 301, 128 S.E. 447 (1925)..…..……52

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir. 1996)……..24

*Orsi v. Kirkwood*, 999 F.2d 86 (4th Cir. 1993)…………………………..……..34

*Peabody Holding Co. v. Costain Group*,
    813 F. Supp. 1402 (E.D. Mo. 1993)……………………..…………………52

*Peoples Bank of Rural Retreat v. Peoples Bank of Abingdon*,
    148 Va. 651, 148 S.E. 651 (1927)…………………………....…..………23, 53

*Persaud v. ICBA Group, Inc.*, 425 Fed. Appx. 223 (4th Cir. 2011)…......…………31

*Pizzeria Uno Corp. v. Temple*,
    747 F.2d 1522 (4th Cir. 1984)…………………………..……….…………..61

*Pollard & Bagby, Inc. v. Morton G.Thalhimer, Inc.*,
    169 Va. 529, 194 S.E. 701 (1938)…………………………………….43, 44

*Powers v. Coble*, 2007 WL 840114
    (W.D. Va. March 16, 2007)……………………………….………………..37

*Ross v. Craw*, 231 Va. 206, 342 S.E.2d 312 (1986)……………..…..……………..27

*Rowland v. Kable*, 174 Va. 346, 6 S.E.2d 633 (1940)………………..……....7, 37

*Seiden Associates v. ANC Holdings,* 959 F.2d 425 (2d Cir. 1992)……………….32

*Scheduled Airlines Traffic Offices, Inc. v. Objective Inc.*,
    180 F.3d 583 (4th Cir. 1999)…………………………………..…13, 14, 32

*Spotsylvania County School Board v. Seaboard Security Co.*,
    243 Va. 202, 415 S.E.2d 120 (1992)…………………………………….14

*Tinsley v. First Nat'l Bank*, 155 F.3d 435 (4th Cir. 1998)…………………………34

*\*Today Homes, Inc. v. Williams,* 272 Va. 462, 634 S.E.2d 737 (2006)……...*passim*

*U.S. v. Light*, 766 F.2d 394 (8th Cir. 1985)……………………….……………..24

*VEPCO v. Northern Va. Reg'l Park Authority*,
    270 Va. 309, 618 S.E.2d 323 (2005)………………………………………….27

*Va. Natural Gas Co. v. Hamilton*, 249 Va. 449, 457 S.E.2d 17 (1995)…..………31

*Volvo v. CLM Equip. Co.*, 386 F.3d 581 (4th Cir. 2004)………………….………24

*Walmart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000)………………..57

*Westbury Coal Mining P. v. JS&K Coal*,
    233 Va. 226, 355 S.E.2d 571 (1987)…………………………….……..52

*Williams v. Dominion Technology Partners LLC*,
    265 Va. 280, 576 S.E.2d 752 (2003)……………………...……........37, 46

*Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991)…………………….…………..3

*Wilson v. Holyfield*, 227 Va. 184, 313 S.E.2d 396 (1984)………………………..52

*Zehler v. E.L. Bruce Co.*, 208 Va. 796, 160 S.E.2d 786 (1968)…………….………24

**Statutes and Rules**:

28 U.S.C. § 1291………………………………………..………….1

28 U.S.C. § 1331………………………………………………………….…..1

28 U.S.C. § 1746(1)………………………………………….……...34

Fed. R. Evid. 902(3)………………………………………...……34

Fed. R. Civ. P. 44(a)(2)……………………………………….…...34

Fed. R. Civ. P. 56(e)………………………..……………………34

Va. Code § 13.1-1045……………………………………………….6

Va. Code Prof. Conduct § 1.7…………………………….………..6, 62

**Secondary Sources**:

American Law Institute, Principles of Corporate Governance § 5.05……..……..39

Chitty on Contracts, ¶12-104……………………………………….……….…..53

Restatement of the Law Third, Employment Law § 8.01
(Tent. Draft No. 4, April 11, 2011)……………………………...…….……37

Restatement of the Law Third, Employment Law § 8.04
(Tent. Draft No. 4, April 11, 2011)……………………….……………37, 46

Salzwedel, *A Contractual Theory of Corporate Opportunity and
a Proposed Statute*, 23 Pace L. Rev. 83 (2002)…………………...…….40

*Authorities upon which Appellant chiefly relies are marked by an asterisk.

## Jurisdictional Statement

The District Court (the Honorable Claude M. Hilton) had federal question

subject matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction

pursuant to 28 U.S.C. § 1291 from the District Court's Order dated September 16,

2011 granting summary judgment for the Defendants because Plaintiff filed a

timely notice on appeal on October 14, 2011. On October 28, 2011, Defendants-

Appellees filed a motion to dismiss this appeal for lack of a final order, which was

denied by this Court on February 15, 2012.[1]

## STATEMENT OF THE ISSUES

1.    Whether the District Court Erred in Failing to Exclude Parol

Evidence, and by Relying Upon Disputed Parol Evidence, to Resolve a Motion for

Summary Judgment?

2.    Whether the District Court Erred in Granting Summary Judgment

When Integrated Contracts Signed by Defendants, and Other Evidence, Contradict

Defendants' Contention that Plaintiff's Chief Executive Officer Can Legally

Compete for the Same Business Opportunities Already Secured by Plaintiff?

---

[1]     Plaintiff filed a protective notice of appeal on December 29, 2011 from the
District Court's November 29, 2011 Order, preserving Plaintiff's contention that
the September 16, 2011 Order was final. On January 10, 2011, Defendants filed
their first notice of appeal, a protective notice of appeal from the November 29th
Order, which has been docketed as Case 12-1082.

3.    Whether the District Court Erred in Granting Summary Judgment When It Found that the Moving Party Had An Actual Unwaivable Conflict of Interest in Filing the Motion for Summary Judgment?

## STATEMENT OF THE CASE

### Proceedings Below

After making a written demand, Curtain member Office of Strategic Services, Inc. (OSS) filed a derivative suit on behalf of Curtain on February 25, 2011, against Defendants Steven Sadeghian, CYSA Development Management Corp. (CYSA), and US Smoke & Fire Services, LLC (Services) claiming that they had breached their fiduciary or other duties to Curtain by having Curtain's CEO, Sadeghian, divert Curtain's business opportunities to himself and his two wholly-owned companies, CYSA and Services.  JA27-61.   The Verified Complaint alleged that, after forming Curtain with Stewart Christ, Sadeghian began competing against it for the same opportunity to sell and distribute smoke and fire curtains,  in violation of Curtain's own Operating Agreement (COA), and contrary to Curtain's exclusive distribution agreement with a British manufacturer of these products (Bradley Lomas Electrolok, or "BLE").[2]

---

[2]    A "*verified*" complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations therein are based on personal

On March 24, 2011, Defendants filed an Answer containing multiple "counterclaims" against OSS and Stewart Christ (the owner of OSS and Curtain's President) seeking to invalidate Curtain's contractual and intellectual property rights in favor of Defendants' competing claims. JA62-151. In addition, CYSA alleged derivative claims ostensibly on behalf of Curtain, seeking to invalidate Curtain's contractual and intellectual property rights.

Defendants moved for summary judgment claiming that the sale of BLE smoke curtains (one type of BLE equipment falling within the Curtain Distribution Agreement (CDA) definition of "Products" subject to the Agreement) was not a business opportunity for Curtain. Instead, Defendants claimed that Sadeghian had separately and subsequently negotiated that particular business opportunity (the sale of BLE smoke curtains) for himself, through the Services Distribution Agreement, for the benefit of Services, an entity he had subsequently created and wholly owned though CYSA, after the incorporation of Curtain and after the execution of the CDA.

Plaintiff filed a motion in limine, invoking the parol evidence rule, and contending that evidence which Defendants sought to use to contradict the contract language expressly including smoke curtains within Curtain's "business purpose"

---

knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis in the original).

in both the COA and CDA—both signed by Sadeghian—was barred by the parol evidence rule. The in limine motion, and corresponding objections, asked the District Court to bar admission of parol evidence for summary judgment or trial purposes.

Because Defendants' summary judgment motion contended that Sadeghian had purportedly executed a better Distribution Agreement for himself through Services (including smoke curtains), than he had previously done for Curtain (one allegedly excluding smoke curtains), Plaintiff Curtain cross-moved for summary judgment. Curtain contended that Sadeghian breached his fiduciary duty to Curtain when, as its CEO, he diverted the opportunity to sell "smoke and fire curtains," including "BLE Products," to himself through the Services Distribution Agreement (SDA). *See, e.g.*, *Today Homes, Inc. v. Williams,* 272 Va. 462, 471, 634 S.E.2d 737, 743 (2006) (Agee, J.) ("It is a fundamental principle that a corporate officer or director is under a fiduciary duty not to divert a corporate business opportunity for personal gain because the opportunity is considered the property of the corporation.").

On September 19, 2011, the District Court entered a single-page "Order" granting Defendant's motion for summary judgment, denying Plaintiff's cross-motion for summary judgment, and granting summary judgment against Defendants on their counterclaims. JA773. The Order stated that a memorandum

4

opinion and order will follow.  On October 14, 2011, Plaintiff Curtain filed its

notice of appeal.  JA181-2.  On November 29, 2011, the District Court filed a

memorandum opinion, and a single-page "Order" repeating its prior ruling.

JA789-809.[3]

## The Memorandum Opinion

The Memorandum Opinion does not address Plaintiff's in limine parol

evidence motion or objections.  The Memorandum Opinion also does not mention

the COA and fails to credit the material facts offered by Plaintiff—including the

plain language of the COA—demonstrating that Curtain possessed a business

opportunity to engage in, and had actually engaged in, the sale of both BLE smoke

and fire curtains.  Nor does the Memorandum Opinion address any fiduciary duties

owed by Sadeghian to Curtain, such as the fiduciary duties not to compete, of

loyalty, and of disclosure of corporate opportunities.

Instead, the District Court relied largely upon the parol evidence offered by

Defendants to conclude that BLE and Sadeghian had reached an unwritten

agreement in early 2009 to make CYSA the exclusive distributor of smoke curtains

in the United States, to the exclusion of Curtain.  This was not only contradicted by

---

[3]    On October 17, 2011, Counterdefendants Christ and OSS filed a notice of
appeal from the District Court's earlier dismissal of their counterclaim.  Appeal
No. 11-2160.

the express language of the two subsequent written integrated contracts (the COA and the CDA) and the chosen name of the company (U.S. Smoke & Fire Curtain, LLC), it was contradicted by Sadeghian's own deposition admission that CYSA never had a distribution agreement with BLE. JA524.

The District Court also supported its conclusion by construing Curtain's July 2009 "Distribution Agreement relating to Smoke and Fire Curtain Products" as implicitly excluding the right to distribute smoke curtains.[4] The District Court rejected Plaintiff's intellectual property claims in favor of Defendants' competing claims, without addressing any fiduciary or other obligations that supported Plaintiff's claims.

The District Court also dismissed CYSA's derivative claims on behalf of Curtain against OSS and Christ on the ground that CYSA had an unwaivable conflict of interest that precluded it from simultaneously seeking to eliminate Curtain's contractual and intellectual property rights while representing Curtain in the same case. JA806 (citing Va. R. Prof. Responsibility 1.7).

---

[4]    The District Court subsequently denied Defendants' motion for an award of statutory attorneys' fees under Va. Code § 13.1-1045 because plaintiff's contractual interpretation was not "without reasonable cause." JA923-4.

## STATEMENT OF FACTS

The verified derivative complaint alleges that Curtain's CEO, Sadeghian, breached his fiduciary duties to Curtain by competing with Curtain for the same business opportunities—the opportunity to market, sell and distribute smoke and fire curtains within the United States. JA27-61. Sadeghian diverted Curtain's business opportunities to himself by creating a new company, defendant Services, which he then used to obtain the same fire safety equipment from the same source that Curtain had already secured under an exclusive distribution agreement with the British manufacturer BLE. *Id*. The remaining Defendant, CYSA, is a commercial real estate management company also wholly owned by Sadeghian.

The derivative complaint alleges breaches of fiduciary duty, tortious interference with contract and business expectancy, conspiracy, trademark infringement, cybersquatting, and unfair competition. *Id*. *See, e.g.*, *Today Homes,* 272 Va. at 471, 634 S.E.2d at 743. (corporate officer owes undivided loyalty to corporation; cannot take corporate opportunity without prior disclosure and corporate consent; and cannot place himself "'in any other position that would subject him to conflicting duties'") (quoting *Rowland v. Kable,* 174 Va. 346, 367, 6 S.E.2d 633, 642 (1940)).

7

## Material Disputed Facts on Summary Judgment

Because this Court must credit the factual record provided by the non-Movant[5]—here Plaintiff Curtain—the facts below are largely drawn from the material facts of record provided by Curtain.  The District Court accepted the contrary allegations of Defendants that Sadeghian had a prior unwritten agreement with BLE in 2009 under which BLE would give to Sadeghian alone, and to his wholly-owned company CYSA, exclusive rights to distribute BLE smoke curtains in the United States, to the exclusion of Curtain.  This contention, however, is directly contradicted by the subsequent COA, and the CDA with BLE, both of which Sadeghian signed in July 2009.  Moreover, it is contradicted by a wealth of material facts that preclude summary judgment for Defendants under their clear and convincing burden of proof.

### A.    The Promotion of a Joint Venture.

Beginning in late 2008, Sadeghian and Christ began discussions with British manufacturer BLE to sell "all of BLE's products in the United States including both smoke and fire curtains."  JA466¶34.   By February 2009, Christ and Sadeghian were referring to each other as "partners."  JA463¶14.  In February

---

[5]     *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011), *cert denied*, 132 S. Ct. 398 (2011).

2009, Sadeghian agreed that his company, CYSA, would finance the costs of this joint venture, and Christ agreed that he would create a website and a nationwide dealer network for the distribution of these products, and that they would split the resulting profits. JA465¶32, 473¶59, 522 (Sadeghian testimony). Prior to his involvement in this joint venture, Christ "was involved in building and managing a national distribution organization for safety and security products, but not for smoke or fire curtains." JA465¶36. CYSA is a real estate property management company. JA463¶17.

The term "Smoke & Fire Curtain" was selected by both Sadeghian and Christ for this joint venture based upon Christ's marketing analysis and recommendation. JA465-6¶¶29, 32, 33. Sadeghian did not "coin" the phrase "Smoke & Fire Curtain." *Id*. ¶29.

Christ conducted conference calls with BLE representatives "during which he created a marketing and sales plan for promoting BLE smoke and fire curtains throughout the United States." JA466¶34. Christ also "undertook the design and implementation of the Curtain web site, for the marketing and sale of smoke and fire curtain products." *Id*. From its launch in April 2009, the Curtain website "included details about BLE smoke curtains, including a linked copy of the BLE smoke curtain technical manual," and promoted "the sale of the SD60, one of several types of smoke curtains that BLE manufactures." JA469-71¶¶45, 50 &

9

JA478-80. BLE approved of the content of Curtain's website." JA470¶50. Since

April 2009, "Curtain marketed and promoted the sale of smoke curtains directly

through its dealers," JA465-70¶¶45, 48, Sadeghian has admitted, in testimony, that

he believed selling smoke curtains was more profitable than selling fire curtains.

JA375.

In 2009, "the only entity with a website that actually sold smoke and fire

curtains was that of the joint venture U.S. Smoke and Fire Curtain, and its

subsequent limited liability corporate form, Curtain LLC." JA476.

### B.    The Curtain Joint Venture Becomes U.S. Smoke & Fire Curtain, LLC.

On July 7, 2009, OSS and CYSA formed Curtain, a Virginia limited liability

company. JA467.   Sadeghian promptly sent Christ an email confirming that the

new entity (Curtain) was jointly owned by his company CYSA, and by Christ's

company, OSS.  *Id.*, JA500.

On July 13, 2009, Sadeghian executed a two year Agreement between

Curtain and BLE entitled   "Distribution Agreement Relating to Smoke and Fire

Curtain Products." JA378, 467¶39.   The CDA provides that BLE appointed

Curtain "as the Supplier's [BLE's] *exclusive distributor to import and distribute*

*the Products in the Territory [the United States]*," and provided that Curtain

"shall purchase the Products *only* from the Supplier [BLE]," and prohibited

Curtain from selling any "Competing Product" in the US. JA383¶¶2.1, 2.2

(emphasis added). The Agreement's definition section (¶ 1.1) defines the term

"Products" (JA382) as including the products described on Schedule 2,

specifically:

1.  Electrically Operated *Smoke* and Fire *Curtains*.

2.  Fixed *Smoke* and Fire *Curtains*.

3.  Associated equipment.[6]

JA403 (emphasis added).[7]

Under the CDA, BLE agreed that it "*shall supply* the Products to the

Distributor for resale in the [United States]." JA386§5.1 (emphasis added). This

meant that BLE agreed to provide smoke and fire curtains to Curtain (i.e., the

"Products" described on Schedule 2) for resale in the United States. For itself,

BLE retained the right to sell "Products" in the United States but <u>only</u> as to an end

user for which BLE received an inquiry that Curtain then declined to contact after

receiving 30 days written notice from BLE. *Id*. BLE further committed that it

---

[6]     Specifically: " 'Products' means the products manufactured by the Supplier and described in schedule 2 together with any other products developed from time to time by the Supplier and which the Supplier may expressly permit the Distributor in writing to distribute in the [United States] . . . ."(JA382§1.1)

[7]     "Competing Product" is defined as a "product so like or similar to one or more of the Products that it is capable of restricting, competing or otherwise interfering with the market for one or more of the Products." (JA381§1.1)

shall "use all reasonable endeavours to meet all orders for the Products forwarded by the Supplier." JA387§6.1.

On August 28, 2009, BLE provided a quote to Curtain for the sale of a specific model of smoke curtain, SD60, sent directly to Sadeghian. JA461¶5 & 493-5. That same day (August 28, 2009), Sadeghian and Christ signed the Operating Agreement for "U.S. Smoke & Fire Curtain, LLC." JA481-83.

The Curtain Operating Agreement(JA407-09):

- Confirmed that "As of [August 28, 2009], the Members [CYSA and OSS] have formed the US Smoke & Fire Curtain LLC, ('USSFC', and/or the 'Company'" (preamble, second paragraph);

- Identified Sadeghian as the Company's CEO with responsibility for the "[o]verall supervision of the business strategic and financial arrangements of the Company (JA407¶4A);"[8]

- Provided that: "The purpose of the Company is to market, sell and distribute *smoke and fire curtains in the United States*. . . (JA408¶6) (emphasis added);

- Prohibited any amendment of the Operating Agreement without unanimous written consent of the members (JA408¶10C);

---

[8]    Christ is named the Company's President.  (JA407¶4B).

12

- Provided that "CYSA will provide additional financing for USSGC as required"(JA409¶11B) (emphasis added);

- Provided that net proceeds generated by the sale of "BLE Products" will be shared equally between CYSA and OSS (JA409¶12A); and,

- Provided that the Operating Agreement constituted "entire agreement of the parties regarding the subject matter hereof. It replaces and supersedes any and all prior discussions, negotiations, understandings and agreements, oral and written, regarding such subject matters. This Agreement is made and shall be governed by the law of the Commonwealth of Virginia." (JA409¶14).

CYSA was identified as a member with 51% ownership of Curtain, with the remaining 49% owned by member OSS. The COA was signed for CYSA by its sole-owner Sadeghian (who was also Curtain's CEO).

By invoking Virginia law for the COA, the parties thereby accepted a parol evidence rule that "'has nowhere been more strictly adhered to in its integrity than in Virginia. *Erlich v. Hendrick Const. Co.*, 217 Va. 108, 112, 225 S.E.2d 665, 668 (1976).[9] The COA is a fully integrated agreement.[10] *See, e.g.*, *Scheduled Airlines*

---

[9]     *Adams v. Seymour*, 191 Va. 372, 383, 61 S.E.2d 23, 28 (1950) ("the parol evidence rule is more rigidly adhered to in this State, and as indicated, is not to be relaxed to admit evidence to prove that a solemn agreement does not mean what it says").

*Traffic Offices, Inc. v. Objective Inc.*, 180 F.3d 583, 594 (4th Cir. 1999) (excluding

pre-Agreement evidence because integration clause "'supersedes all prior oral or

written agreements, commitments, or understandings'") (citing *Spotsylvania*

*County School Board v. Seaboard Surety Co.*, 243 Va. 202, 415 S.E.2d 120

(1992)).

### C.    While Curtain's CEO, Sadeghian Creates a New Entity, Services, and Starts Competing with Curtain for the Opportunity to Sell the Same Products from the Same Source.

After the organization of Curtain on July 7, 2009, and *after* his July 13,

2009 execution of the CDA, Sadeghian formed Services as a Delaware limited

liability company on July 16, 2009. JA467¶38. Sadeghian claims that, thereafter

in August 2009, he negotiated a separate Distribution Agreement with BLE on

behalf of Services for the sale of BLE smoke and fire curtains. The Services

Distribution Agreement (SDA) has the same title as the CDA ("Distribution

Agreement relating to Smoke and Fire Curtain Products"), follows the same

format, and contains identical agreements appointing Services as BLE's "exclusive

distributor" for the same "Products" in the United States, committing Services to

---

[10]    The COA was the subject of prior negotiations. Although Sadeghian
initially denied this under oath at the CYSA deposition (JA412**),** when confronted
with numerous emails to the contrary, he admitted participating in email exchanges
with Christ on prior drafts of the Operating Agreement, and admitted negotiating
its terms over the two month period prior to its August 28, 2009 execution,
including at least one face-to-face meeting to discuss its terms. JA414, 416, 418,
422, 424, 428-29.

purchase the same "Products" only from BLE, and obligating BLE to supply these "Products" to Services.   JA383¶¶2.1, 2.2.

But Sadeghian "never disclosed to OSS, Curtain, or [Christ] in 2009 that he was negotiating with BLE for contractual rights with BLE other than those he was pursuing on behalf of Curtain." JA361¶35  Sadeghian did not disclose to Curtain, OSS, or Christ "that he was signing the Services Distribution Agreement in advance of his executing it," and he never "sought or obtained their approval to do so."  JA361¶¶5, 7.  To the contrary, Defendants "hid the existence of the Services Distribution Agreement from [Mr. Christ] until March of 2010." JA469¶41.

Beginning in early 2010, Sadeghian began offering a series of different and contradictory explanations for his efforts to divert smoke curtain business opportunities from Curtain.  Initially, Sadeghian  (falsely) claimed that Curtain lacked the necessary insurance to install sm oke curtains, while claiming  that Services had obtained such ("completed operations") insurance.  JA461¶7 & JA496-7 (March 7, 2010 Sadeghian email stating that Services had the necessary insurance to pursue smoke curtain opportunity presented by a Curtain dealer, but falsely asserting that Curtain lacked this necessary insurance).  In fact, Sadeghian had previously negotiated an insurance policy for Curtain that included this coverage, but secretly had Services listed on the policy as an "other insured," thereby having Curtain pay for Services' insurance costs for installing BLE

15

products. JA461¶7.[11] Sadeghian's March 2010 false insurance justification for

diverting smoke curtain opportunities from Curtain to Services, however, is flatly

inconsistent with Sadeghian's later contention that he had previously secured an

exclusive smoke curtain distribution agreement from BLE for Services in August

2009. For its part, CYSA never obtained insurance for the sale or installation of

BLE products. JA520.

Sadeghian's next justification came in March 2010, when Sadeghian told

Christ that "I have my own contract now, and I can compete with you whenever I

want to." JA469¶46. Specifically, Sadeghian represented to Christ that he had

just negotiated an "Addendum" to the existing CDA which authorized Services to

purchase the same BLE products. JA467¶35, JA469¶46 & JA512 (April 22, 2009

Christ responsive email to Sadeghian explaining problems caused by "my

understanding of addendum or revisions that was made to Distribution Agreement

between [Curtain] and BLE"). Christ then demanded a copy of this Addendum,

orally and in writing, but Sadeghian refused, and has not produced the Addendum

to this day. *Id*. The document later claimed by Defendants to be the SDA *does*

contain a reference to an Addendum on its table of contents, with a corresponding

---

[11]    This misrepresentation would later be repeated in the Defendants' Answer, at ¶39, wherein Defendants falsely claim that Curtain "does not have insurance to install BLE products." JA70. *See also* JA520 (Sadeghian repeats misrepresentation).

page number, but the listed page is missing from the document. JA241 (listing "Addendum to Agreement" at p. 27, but containing no p. 27). No such Addendum is mentioned in the CDA, or on its table of contents. JA379-80.

Sadeghian's refusal to provide Curtain a copy of the "Addendum" created uncertainty as to what contractual rights Curtain could offer new dealers. As a result, Christ had to suspend recruitment of new dealers for Curtain. JA469¶45, JA472¶58.

Sadeghian's justification for his competition with Curtain subsequently changed to a claim that he had negotiated a separate Distribution Agreement with BLE for Services (outside of the CDA).[12] On summary judgment, Defendants contended that Sadeghian had disclosed this to Curtain at some unstated time. But, contrary to this contention, the Defendants admitted in their July 12, 2011 interrogatory answers that the SDA "was only communicated between Dr. Sadeghian and BLE; to Defendants' knowledge no other party was given the agreement, excluding the production in this case." JA777.

Plaintiff established, for summary judgment purposes, that, in 2009 Sadeghian did not disclose to OSS, Curtain, or Christ "that he was negotiating with

---

[12]    On July 5, 2011, testifying for CYSA at deposition, Sadeghian admitted that CYSA never had a distribution agreement with BLE. JA520. But in his August 11, 2011, declaration in support of summary judgment Sadeghian falsely stated that CYSA had become BLE's first American distributor in 2004. JA277¶7.

17

BLE for contractual rights other than those he was pursuing on behalf of Curtain."
JA467¶35. "Sadeghian did not disclose to Curtain, OSS or Mr. Christ that he was
signing the Services Distribution Agreement in advance of his executing it."
JA361¶5.

While Defendants disputed the material fact that Sadeghian failed to disclose
the SDA to Curtain, the only "evidence" they offered about disclosure of the SDA
fails to mention the SDA whatsoever, JA627-82, 685-710,and fails to address their
own interrogatory denial of having communicated this Agreement to any entity
other than BLE. Sadeghian also testified that he could not locate a single
document containing any communication with BLE about the SDA. JA534-35.

Thus, there is no record evidence that Defendants made any disclosure to
Curtain, OSS or Christ about the SDA in 2009. This corroborates Plaintiff's
position that the first disclosure of a competing agreement was in March 2010 with
the sudden disclosure by Sadeghian that he had just negotiated an alleged
"Addendum" to Curtain's own Distribution Agreement which authorized him to
compete with Curtain through Services. JA469¶46. Again, however, if Defendants
had actually procured the SDA in August 2009, as Sadeghian claims in this suit,
then there was no reason for Sadeghian to resort to his first two justifications in
March 2010 (the insurance misrepresentation, followed by the alleged but
unproduced CDA Addendum).

18

Sadeghian's summary judgment motion raised yet another justification for his conduct—that BLE and he had agreed in early 2009 that CYSA would have exclusive distribution rights for smoke curtains. This is not only contradicted by the subsequent Curtain agreements--it is contradicted by CYSA's deposition testimony (by Sadeghian), that at no time did CYSA enter into a distribution agreement with BLE. JA524. Sadeghian further admitted that CYSA never obtained insurance for the sale or installation of BLE products. JA520. Sadeghian testified that on the single job that CYSA had been involved in prior to June 2009, "BLE did the job directly with the end user," with BLE handling the insurance. JA520-1.[13] Finally, as of the August 2011 summary judgment proceedings, BLE's web site identified Curtain as its only dealer in the United States. JA472¶55.

Despite the February 25, 2011 Complaint allegation that Sadeghian was harming Curtain by competing against it and Curtain's Dealers for the same business opportunities, on April 26, 2011 Sadeghian unilaterally terminated all fifteen of Curtain's dealers nationwide, without notice to, or the consent or approval of, Curtain, OSS, or Christ. JA471¶ 53; JA183¶16, JA184¶17. *Cf. Today Homes,* 272 Va. at 471 (corporate officer may not place himself "in any other

---

[13]    Even the Millington "affidavit" states that Sadeghian only bought BLE smoke curtains on a "couple of projects" before and after the Curtain Distribution Agreement. JA205.

position that would subject him to conflicting duties"). Sadeghian's alleged

justification for terminating all of Curtain's dealers was the false claim that the

Curtain Dealer's agreements required their termination because of BLE's April

2011 notification of the prospective termination of the CDA at the end of its two

year term. JA184¶¶18, 19; JA436.

### D.    Curtain Creates Trademarks for the Sale of Smoke and Fire Curtains, Which Are Then Infringed Upon by Defendants.

In April 2010, Curtain, through Christ, applied for trademark registration for

one of the smoke curtains that it sold, known as an "Elevator Shield." JA464¶20.

The term "Elevator Shield" was developed by Christ, Sadeghian, and Linda

Garzone "on behalf of Curtain," Curtain was the first to use this term, and "it was

not used by either CYSA or Service[s] prior to Curtain's trademark application."

*Id.* ¶21. "Curtain was the first to use Elevator Shield in commerce, and has done

so through the installation or sale of dozens of products, that is, BLE model

FC60S." *Id.* Elevator Shield is a reference to a smoke curtain, JA469¶44,

JA472¶56, under the definitions of the International Code Council. JA464¶26. In

October 2010, the U.S. Patent and Trademark Office registered "Elevator Shield"

as the trademark of Curtain, U.S. Reg. No. 3,897, 681. JA463¶20, JA476¶83.

Curtain's largest volume of sales was for the Elevator Shield. JA469¶44.

Christ registered the mark for Curtain pursuant to his duty to protect Curtain's intellectual property. For their part, Sadeghian and CYSA had a conflict of interest as to this property, because of their ownership of Services, a competitor of Curtain. JA474¶68, 69.

BLE has not designated any trademarks for use in the U.S. (JA475¶77), and has not designated Elevator Shield as its trademarkJA475¶70. Although BLE reserved the right in the CDA to designate new trademarks, it never exercised that right during that agreement for any mark, and it's time for making such a designation has expired. JA474¶65, 67. BLE never asserted Elevator Shield in its materials. JA475¶70. "Defendants infringed upon, copied, passed off and unfairly competed with these terms by placing them on Services website and in promotional material created by Services." *Id*. ¶73.

## SUMMARY OF ARGUMENT

The District Court erred in failing to address the in limine motion, and objections, seeking to exclude parol evidence as to the prior negotiations and personal intentions of the parties offered by Defendants to contradict these integrated agreements (the COA and the CDA). Further, the District Court erred in failing to credit Plaintiff's evidence (including the contractual language signed by Defendants, and the Defendants' fiduciary and contractual obligations) disputing the parol evidence offered by Defendants, all of which demonstrate numerous

material issues of disputed fact precluding summary judgment.  Finally, the

District Court erred in correctly finding that the movant CYSA had a conflict of

interest adverse to Curtain in seeking summary judgment, but then granting that

motion against Curtain.

## ARGUMENT

### Standards of Review

This Court reviews a "grant of summary judgment de novo, reviewing the

facts and the reasonable inferences therefrom in the light most favorable to the

non-moving party," which here is Plaintiff.  *Bonds,* 629 F.3d at 380.  In performing

this task, "a court is not entitled to either weigh the evidence or make credibility

determinations."  *In re French*, 499 F.3d 345, 352 (4th Cir. 2007) (reversal of

summary judgment for making credibility determinations).  Once a fiduciary

relationship is established, "any transaction to the benefit of the dominant party

[fiduciary], and to the detriment of the other party is presumptively fraudulent,"

and shifts the burden of proof to the fiduciary.  *Grubb v. Grubb*, 272 Va. 45, 53,

630 S.E.2d 746, 751 (2006) (Keenan, J.).  Defendants' Answer admits that

Sadeghian was Curtain's CEO "at all relevant times" and that Plaintiff's officers

are fiduciaries of Plaintiff.  JA64¶8, ¶152.  A fiduciary has the burden of

overcoming the presumption of fraud by clear and convincing evidence.  *Grubb,*

272 Va. at 53-54, 630 S.E.2d at 751; *Abington Pediatrics v. Carter*, 2002 WL

485038, *14 (W.D. Va. March 25, 2002) (same).

A fiduciary bears the burden of justifying his conduct by clear and

convincing evidence, *Grubb*, and shoulders this same burden for summary

judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Regardless of who bears the burden of proof at trial, it is the initial burden of the

moving party (here, Appellees) to demonstrate the absence of any material factual

dispute. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th

Cir. 2003); *In re French*, 499 F.3d at 352.

In Virginia, an unambiguous contract "becomes the law of the case, unless

the contract is repugnant to some rule of law or public policy." *McCain, Inc. v.

Arlington County*, 249 Va. 131,135, 452 S.E.2d 659, 662 (1995). This Court

exercises *de novo* review over contract interpretation. *Choice Hotels Int'l v. BSR

Tropicana Resort*, 252 F.3d 707, 710 (4th Cir. 2001).

The parol evidence rule renders extrinsic evidence immaterial to a court's

summary judgment considerations. For example, in *Centex Constr. v. Acstar Ins.

Co.*, 448 F. Supp.2d 697 (E.D. Va. 2006), Judge Cacheris refused to consider parol

evidence when making a summary judgment ruling. *Id.* at 710. (citing and quoting

*Peoples Bank of Rural Retreat v. Peoples Nat'l Bank of Abingdon*, 148 Va. 651,

23

657, 139 S.E. 325 327(1927) ("If [a contract] is not ambiguous in its terms it must

be construed without aid of the views of the parties as to it or of their conduct

under it."). *Accord*, *Dixon v. S & S Loan Service*, 754 F. Supp.1567, 1571 (S.D.

Ga. 1990) (parol evidence immaterial on summary judgment) (cited by *Hicks v.

Star Imports, Inc.*, 5 Fed. Appx. 222 (4th Cir. March 7, 2001) (unpublished

opinion)). *See also Volvo v. CLM Equip. Co*., 386 F.3d 581, 597 (4th Cir. 2004)

(parol evidence rule applies to dealer agreements on motion for judgment on

pleadings).

On summary judgment the parol evidence rule must be applied first, in order

to determine whether a genuine issue of material fact exists, *U.S. v. Light*, 766

F.2d 394, 396 (8th Cir. 1985), and any contract "ambiguity must be construed

against the moving parties." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d

1182, 1192 (2d Cir. 1996).

### The District Court Erred in Granting Summary Judgment.

The District Court erred in granting summary judgment because: (1) it failed

to address Plaintiff's in limine motion against, and objections to, Defendants' parol

evidence, relying instead up upon Defendants' parol evidence contradicting the

agreements signed by Sadeghian; (2) it failed to address, or to enforce, the

fiduciary duties of Sadeghian that prohibit him, individually, from diverting

24

business opportunities from or competing with Plaintiff; (3) it failed to address, or

to credit, the material factual allegations produced by Plaintiff; (4) it improperly

invalidated Plaintiff's intellectual property, including Plaintiff's registered

trademarks; and (5) it erred in correctly finding that Defendant CYSA had an

unwaivable conflict of interest in moving for summary judgment, but then granting

that motion.

### A.    The District Court Erred by Failing to Exclude, and by Relying Upon, Defendants' Parol Evidence Contradicting the COA and CDA.

The core, but inadequate, defense in this case is that the sale of smoke

curtains is not a business opportunity of Plaintiff Curtain.[14]  The Curtain Operating

Agreement conclusively contradicts this defense, making it both a material fact and

one which precludes summary judgment.   The COA, signed by Sadeghian,

unambiguously identifies the sale of smoke curtains, and of "BLE products," as

within the "business purpose" of Curtain, and requires that CYSA continue to

finance this business of Curtain.  To obtain summary judgment, however,

Defendants offered evidence of alleged prior negotiations, representations or

understandings by Sadeghian and Mr. Millington of BLE, to contend that smoke

curtains were excluded from the scope of Curtain's business.   While this parol

---

[14]    This defense is facially insufficient because it fails to address fire curtains, a undisputed business opportunity of Curtain that Sadeghian diverted to Services.

evidence would, at best, create factual disputes on this record, it is inadmissible under the parol evidence rule.[15]

In granting summary judgment, the District Court did not address Plaintiff's in limine motion or objections seeking exclusion of this parol evidence. Nor did the District Court mention the Curtain Operating Agreement—the integrated expression of the intent of the parties--in granting summary judgment. Instead, the District Court relied extensively upon the parol, disputed evidence offered by Defendants regarding pre-Operating Agreement negotiations, including two unauthenticated and otherwise inadmissible declarative documents allegedly from BLE employee David Millington (one an "affidavit," the other a "supplemental declaration"), with attached exhibits that Plaintiff had moved to strike. This was error.

The COA unambiguously states that the parties intended: (1) that U.S. Smoke & Fire Curtain, LLC engage in the business of selling smoke *and* fire curtains (JA359¶6); (2) that CYSA and OSS would split the revenue generated from the sale of "BLE products" (JA360¶12A); and (3) that CYSA would provide the required "additional financing" to pursue this opportunity for Curtain.

---

[15]    In Virginia, the parol evidence rule is substantive law, not merely a rule of evidence, *Zehler v. E.L. Bruce Co.*, 208 Va. 796, 797 n.2, 160 S.E.2d 786, 788 n.2 (1968).

JA359¶11.  These undertakings unambiguously incorporate the sale of BLE

smoke and fire curtains within the business of Curtain.

By expressly making the Curtain Operating Agreement subject to Virginia

law, the parties thereby accepted a parol evidence rule that "'has nowhere been

more strictly adhered to in its integrity than in Virginia.'" *Erlich*, 217 Va. at 225

S.E.2d at 668.  In Virginia, "'when an agreement is complete on its face, is plain

and unambiguous in its terms, the court is not at liberty to search for its meaning

beyond the instrument itself.'"[16]  "The writing alone is the evidence of the contract,

and no other will be received." *Coal River Collieries v. Eureka Coal*, 144 Va. 263,

283, 132 S.E. 337, 343 (1926).

"[P]arol evidence is irrelevant to the interpretation of an integrated contract

under Virginia law." *Forrest Creek Associates, Ltd. v. McLean S&L Ass'n*, 831

F.2d 1238, 1242 (4th Cir. 1987) (Wisdom, J.) (citing *Amos v. Coffey*, 228 Va. 88,

320 S.E.2d 335 (1984)).  "[I]f the intent of the parties can be determined from the

language they employ in their contract, parol evidence respecting their intent is

inadmissible." *VEPCO v. Northern Va. Reg'l Park Auth.*, 270 Va. 309, 315, 618

---

[16]  *Ross v. Craw*, 231 Va. 206, 212, 342 S.E.2d 312, 312 (1986) (quoting *Globe Co. v. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 733 (1965)).

S.E.2d 323, 326 (2005).[17]  "'[P]arol evidence of prior or contemporaneous oral

negotiations or stipulations is inadmissible *to vary, contradict, add to, or explain*

*the terms of a complete, unambiguous, unconditional, written instrument,*'"

*Langman v. Alumni Ass'n of Univ. of Virginia*, 247 Va. 491, 498, 442 S.E.2d 669,

674 (1994) (emphasis added) (quoting *Amos,*, 228 Va. at, 320 S.E.2d at 337 ).  The

type of parol evidence offered by Defendants here—declarations by Sadeghian and

Millington as to the intent of the contracting parties in the COA and CDA—is "the

very state of affairs the parol evidence rule is designed to prevent."  *Berry v.*

*Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).

The District Court failed to confine its examination of the parties' intent to

the four corners of the COA, and indeed failed to discuss the COA at all.  Rather

than credit the COA, the District Court accepted the self-serving declarations of

Sadeghian to the effect that he successfully negotiated with BLE in early 2009 to

establish two companies, one to sell BLE fire curtains (Curtain) and a separate

company to sell BLE smoke curtains (Services), with the latter (Services) formed

"to continue with the ongoing development and purchase of BLE smoke curtains

products" that CYSA had allegedly previously done.  JA798.  This parol evidence

concerning Sadeghian's alleged negotiations with BLE is not only refuted by

---

[17]      Contract integration is a legal question. *Martin Marietta Corp. v. Fireman's Fund, Inc.*, 852 F.2d 566, *5 (4th Cir.  July 22, 1988) (unpublished opinion).

Plaintiff's contrary summary judgment showing,[18] it is unambiguously contradicted by the plain language of the COA (signed by Sadeghian *on behalf of CYSA*) identifying both smoke and fire curtains as within Curtain's "business purpose." The COA also obligates CYSA to share equally with OSS the revenue derived from all "BLE Products," which includes smoke and fire curtains.

The District Court also simply accepted Sadeghian's claimed conduct (allegedly negotiating a better distribution agreement including smoke curtains for Services than he had for Curtain) without addressing whether Sadeghian's fiduciary or other legal obligations precluded him from such self-dealing. *Compare Today Homes,* 272 Va. at 472 (officer who created new company to exploit land acquisition opportunity by contracting with third party violated his fiduciary duties to existing employer). Here, Sadeghian's fiduciary duties as to Curtain's intended business are defined by the COA to include smoke curtains, which he cannot contradict through parol evidence.

Curtain's "Distribution Agreement relating to Smoke and Fire Curtain Products," (JA378) also bars contrary parol evidence, as a result of its two robust integration clauses (JA399§§26.1, 26.2) and its adoption of English and U.S. law

---

[18]    Mr. Christ represented that: "At no time during the negotiations for the Curtain-BLE Distribution Agreement did BLE indicate orally or in writing that smoke curtains would be excluded from the Agreement." JA466¶34.

(*Id*. §27.1).   In this Agreement, BLE appointed Curtain to be its "exclusive

distributor to import and distribute Products in" the United States (JA383¶21.),

with Products defined as including both smoke and fire curtains (JA383 & 403).

BLE agreed that it "*shall supply the Products* to the Distributor [Curtain].

JA386¶5.1 (emphasis added).   Curtain agreed to purchase such "Products"

exclusively from BLE.   JA383¶2.1.   BLE, in turn, agreed not to sell the "Products"

in the United States except when Curtain failed timely to follow up on a specific

written customer lead from BLE.   JA386¶5.1.   Each of these contractual provisions

contradicts the justification now offered by Defendants for their self-dealing--that

U.S. Smoke & Fire Curtain, LLC. was, somehow, not in the smoke curtain

business.

The parol evidence rule is also enforced under English law.   *See, e.g*.,

*Medline Indus., Inc. v. Maersk Medical Ltd.*, 2004 WL 422718, *7 (N.D. Ill. Feb.

24, 2004) (applying English parol evidence rule to  distribution agreement); *In re

McMahon*, 236 B.R. 295, 305  (S.D.N.Y. 1999) (applying parol evidence rule

under English law); *Chartbrook Ltd v. Persimmon Homes Ltd*,  2009 UKHL 38, ¶

42 ("The rule excludes evidence of what was said or done during the course of

negotiating the agreement for the purpose of drawing inferences about what the

contract meant.").   Accordingly, District Court erred in relying upon parol

evidence to contradict the COA and CDA.

Defendants opposed application of the parol evidence rule by vaguely claiming a mutual mistake of fact or fraud in connection with the Operating Agreement, but without seeking to invalidate it. But mutual mistake must be pled to overcome the parol evidence rule, and it was not so here. *See, e.g., Va. Natural Gas Co. v. Hamilton*, 249 Va. 449, 454, 457 S.E.2d 17, 20 (1995).

Mistake or fraud must be proven by clear and convincing evidence. *Coal River*, 144 Va. at 277, 132 S.E. at 342. Defendants presented no evidence of a mutual mistake or of fraud. For example, the two summary judgment Sadeghian declarations submitted by Defendants (a necessary party to any claim of fraud or mutual mistake) do not mention mistake, fraud, or the Curtain Operating Agreement. Defendants argue, however, that "[w]hether the [alleged] mistake was mutual or unilateral, in either event there is a factual question for the jury which will require the introduction of parol evidence." JA749. Even had Defendants made a factual showing of mistake by OSS, it would justify a trial, not summary judgment.

Fraud requires clear and convincing proof of a party's reasonable and justifiable reliance upon a false statement, but "one may not reasonably rely upon an oral statement when he has in his possession a contrary statement in writing." *Foremost Guaranty Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 126 (4th Cir. 1990). *Accord, Persaud v. IBCA Group Inc.*, 425 Fed. Appx. 223 (4th Cir. April 25, 2011)

(unpublished opinion). "[A] party to a contract cannot reasonably rely on oral statements that are contradicted by the plain terms of the final agreement." *Fransmart LLC. v. Freshii Development, LLC.*, 768 F.Supp.2d 851, 865 (E.D. Va. 2011) (citing *Scheduled Airlines*, 180 F.3d at 590; *Call Carl Inc. v. BP Oil Corp.*, 554 F.2d 623, 631-32 (4th Cir. 1977)). Not only does the Curtain Operating Agreement unambiguously identify smoke curtains as within Curtain's business purpose(JA359), Curtain's legal name does so too: U.S. Smoke & Fire Curtain LLC.

Defendants' Answer alleged that Sadeghian did not even read the COA before signing it. JA101¶66. Clear and convincing proof of reasonable or justifiable reliance on a prior representation can't be established by a party who admits that he failed to read the contract. *Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir. 2009) (even assuming party misled, documents they signed were clear, and they "cannot be heard to complain when they failed to read the relevant documents."). *See Adams*, 191 Va. at 380 (party bound to deed even if not read).

Finally, Defendants make an unsupported claim that the COA was ambiguous, even though, on summary judgment, any alleged ambiguity therein would have to be resolved against the Movants. *Seiden Associates v. ANC Holdings,* 959 F.2d 425, 429 (2d Cir. 1992). JA747. Defendants find ambiguity in the Operating Agreement's use of "BLE Products" to encompass smoke

32

curtains, versus their claim that the subsequent CDA definition of BLE "Products" is restricted to fire curtains. This simply confirms that the undisputed scope of the Operating Agreement includes smoke curtains, and falsely assumes that smoke curtains fell outside of the CDA. *See, e.g. Medline Indus.,* 2004 WL 422718, *8 (where distribution agreement defines products by attached list, products defined by attached list).

Moreover, evidence parol to the Operating Agreement (including the CDA) cannot "be used first to create an ambiguity and then remove it." *Amos*, 228 Va. at 93, 320 S.E.2d at 338; *Money Point Diamond Corp. v. Union Corp.*, 998 F.2d 1009, *4 (4th Cir. July 23, 1999) (unpublished opinion)(citing *Amos*, "Virginia law precludes a court from relying on extrinsic evidence to create an ambiguity in the writing") *See also Anden Grp., v. Leesburg Joint Venture*, 237 Va. 453, 377 S.E.2d 452 (1989) (separate contracts cannot be used to contradict unambiguous contract).

**B.     The District Court Erred in Not Striking and Relying Upon Unauthenticated Documents Containing Parol Evidence to Grant Summary Judgment.**

The Court additionally erred in relying upon one specific type of parol evidence to which Plaintiff objected and moved to strike—a foreign "affidavit" and a "supplemental declaration" by BLE employee David Millington, a British citizen, that were not only parol, but also inadmissible. These invalid Millington

33

documents were offered to supply parol evidence, allegedly from Millington's

perspective, about the dueling CDA and SDA and the alleged but unwritten BLE

agreement to restrict smoke curtain rights to CYSA.  These two Millington

documents, in turn, purport to authenticate various attached documents.

Unsworn and unauthenticated documents cannot be considered on a motion

for summary judgment; rather, evidence must be in a form authorized by Fed. R.

Civ. P. 56(e).  *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998)

(unsworn statements inadmissible on summary judgment); *Orsi v. Kirkwood*, 999

F.2d 86, 92 (4th Cir. 1993).  The initial "affidavit" furnished by Mr. Millington was

signed in India (JA209), but lacks any certification by an American consular

official, rendering it inadmissible for summary judgment purposes.  *BS Sun*

*Shipping Monrovia v. Citgo Petroleum Corp*., 509 F. Supp.2d 334, 344 (S.D.N.Y.

2007) (striking from summary judgment record affidavit signed abroad without

certification).  *See* Fed. R. Evid. 902(3) (requiring certification); Fed. R. Civ. P.

44(a)(2) (same).  The second Millington document, styled a "Supplemental

Declaration," was purportedly signed in China (JA580), but lacks the required

attestation that it is made "under penalty of perjury under the laws of the United

States."  28 U.S.C. § 1746(1).

Moreover, Plaintiff furnished evidence as to why Millington otherwise

lacked credibility, including that Sadeghian had admitted making substantial cash

34

payments to Millington, had represented that Millington had a profit sharing

interest in Services, and had discussed creating a separate manufacturing source of

smoke and fire curtains with Millington. JA471¶51. Further, because the COA

required a 50-50% split of profits between CYSA and OSS from BLE products, its

circumvention provided both CYSA and BLE with the opportunity to exploit the

50% of the profits that would have otherwise been due Curtain.

### C.    The District Court Erred in Failing to Address Defendant Sadeghian's Fiduciary Duties to Plaintiff.

The District Court also erred by ruling, as a matter of law, that Curtain

lacked a business opportunity to sell BLE smoke curtains because Sadeghian,

while Plaintiff's CEO, had separately negotiated this contractual right for himself

and his newly created company Services. The District Court did so without

accounting for Sadeghian's countervailing contractual and fiduciary duties to his

company and employer-Curtain. No legal authority supports defendants' claim

that a corporate officer can seize a corporate business opportunity if only he can

negotiate a contract with a third party to do so. The only authority cited by the

District Court—*Today Homes*—stands firmly to the contrary. 272 Va. at 472.

Curtain contends that Sadeghian, its CEO at all relevant times, breached his

fiduciary duty to Curtain by competing against it for the same business

opportunities that Curtain was created to pursue--the sale and distribution of smoke

and fire curtains, and of "BLE Products." The District Court ruled that, because Sadeghian separately negotiated these opportunities for himself, the opportunity to exploit BLE smoke curtain opportunities did not belong to Curtain. The District Court's conclusion, however, assumes without stating that Sadeghian lacked any common law or contractual obligation to secure these business opportunities for Curtain, rather than for himself. But the COA and CDA make clear that smoke curtains are a business opportunity belonging to Curtain, to be financed by CYSA, for Curtain's benefit.

The corporate opportunity doctrine is the "unbending rule" of Virginia law and compels the same result here. *Today Homes*, 272 Va. at 471. In that case, the Virginia Supreme Court examined whether two officers (Woodhouse and Williams) of a real estate development company breached their fiduciary duties to their company by forming another company to acquire land from a third party to develop for their own personal benefit. The Supreme Court held that defendant Woodhouse, one of the two officers, breached his fiduciary duty by doing so, notwithstanding his claim to have acted in his "individual" capacity, his lack of job responsibilities for land acquisition, and his belief that his employer was uninterested in the specific opportunity. 272 Va. at 466. ("It is a fundamental principle that a corporate officer or director is under a fiduciary duty not to divert a corporate business opportunity for personal gain because the opportunity is

36

considered the property of the corporation."). This case is even more compelling, as Sadeghian has responsibilities for developing Curtain's business opportunities to sell smoke and fire curtains.

A corporate officer owes the duties of "utmost good faith" and loyalty to his corporation. *Feddeman & Co. v. Langan Assocs.*, 260 Va. 35, 43, 530 S.E.2d 668, 673 (2000). A corporate officer breaches his fiduciary duty to his company if he diverts corporate opportunities to himself. *Today Homes*, 272 Va. at 471, 634 S.E.2d at 743. A corporate officer also cannot compete with his own company. *Williams v. Dominion Tech. Partners LLC,* 265 Va. at 289, 576 S.E.2d at 757.[19] *See also Powers v. Coble*, 2007 WL 840114, *5 (W.D. Va. March 16, 2007) (denying summary judgment on breach of fiduciary duty claim against employee and partner for competing with business). The duty of loyalty also mandates that corporate officers avoid conflicts of interest, that is, it forbids an officer from placing himself "'in any other position that would subject him to conflicting duties'" to his company. *Today Homes,* 272 Va. at 471, (quoting *Rowland*, 174 Va. at 367, 6 S.E.2d at 642).

---

[19]    *See* Restatement of the Law Third, Employment Law § 8.01(b)(ii), § 8.04 (Tent. Draft No. 4, April 11, 2011) ("Employees breach the duty of loyalty by . . .(ii) competing with the employer while employed by the employer").

The duty of loyalty is enforced by imposing the burden of: (1) disclosing business opportunities to the company; and (2) obtaining its consent to exploit them.  *Id.*  Plaintiff established that there was neither disclosure to, nor consent by, Curtain for the diversion of this corporate opportunity to Defendants.  To the contrary, this business opportunity had previously been secured for Curtain in both its COA and CDA agreements.

"[A]n officer's desire to take an opportunity as his own, puts him on notice of his fiduciary duty to disclose the opportunity to the corporation before acting upon it for his personal benefit." *Today Homes*, 272 Va. at 472.  *Today Homes* confirms that this duty is personal-- it "makes no difference whether the corporate opportunity came to the corporate fiduciary in the fiduciaries' capacity as a corporate officer or in some 'individual' capacity." *Id.*   Hence, when Sadeghian allegedly executed the SDA in August 2009, he was obligated to protect, and to secure for Curtain, business opportunities either for "BLE Products," or for "smoke and fire curtains."  An officer's good faith belief that an opportunity is his does not relieve him of the duty to disclose and tender that opportunity to his company before taking it for himself.  *Id.*   Finally, once a company has established a prima facie case of a corporate opportunity, and that Defendant failed to disclose and tender, the burden of proof shifts to the Defendant to prove why taking it was not a breach of fiduciary duty. *Id*. at 744.

38

The facts material to the question of whether Sadeghian breached his fiduciary duty are largely undisputed—Sadeghian admits that he exploited the business opportunities at issue (involving selling smoke and fire curtains) for himself through his two wholly-owned companies, Services and CYSA. His only defense is his claim that he had a legal right to exploit these opportunities because he personally negotiated for those rights for himself with a third party, BLE, allegedly in August 2009. But at all relevant times, Sadeghian owed his fiduciary duties to Curtain. Neither he, nor a third party, can unilaterally exempt Sadeghian of his fiduciary duties to Curtain, especially for his own personal profit. A corporate officer has no legal right to take a corporate opportunity by claiming it for himself in his "individual" capacity. *Today Homes*, 272 Va. at 472.

### D.    BLE Products, and Smoke and Fire Curtains, Are Business Opportunities of Plaintiff U.S. Smoke and Fire Curtain, LLC.

Courts employ different standards for determining whether an opportunity belongs to a company, including (1) the line of business test; (2) the related avowed business purpose test; and (3) the American Law Institute's full disclosure standard in section 5.05 of the Principles of Corporate Governance *See, e.g.*, *Guiletti v. Guiletti*, 65 Conn. App. 813, 947-48 (Conn. App.) (describing tests; whether corporate opportunity exists is a factual question), *cert denied*, 258 Conn. 946 (2001). *See also* Salzwedel, *A Contractual Theory of Corporate Opportunity and a Proposed Statute*, 23 Pace L. Rev. 83, 97-106 (2002) (describing tests).

Here, the Virginia Supreme Court appears to have endorsed the full

disclosure standard, under which an officer's desire to take the opportunity triggers

the duty to disclose. *Today Homes*, 272 Va. at 472 (duty "becomes operative and

relevant only when an officer receiving information about a potential corporate

opportunity then appropriates that opportunity for his own use"). *Today Homes*

explained that an "officer's desire to take an opportunity as his own, puts him on

notice of his fiduciary duty to disclose the opportunity to the corporation before

acting upon it for his personal benefit." *Id.* [20]

Under any standard, where, as here, Curtain has a contractual right to a

business opportunity, a prima facie case is satisfied. Curtain's prima facie case

that smoke and fire curtains are a business opportunity belonging to it includes: (1)

its legal name identifying both smoke and fire curtains as part of its business; (2)

its Operating Agreement which identifies both smoke and fire curtains as within its

business purpose, including "BLE products;" (3) its website and related brochures

which market fire and smoke curtains; (4) its Distribution Agreement under which

BLE agrees to supply Curtain with fire and smoke curtains for resale; (5) its

---

[20]    *Today Homes* cited, and followed, precedent from Massachusetts which had
held that mere non-disclosure of an opportunity was sufficient to breach an
officer's fiduciary duty.    272 Va. at 472 (citing *Demoulas v. Demoulas Super
Mkt., Inc.,* 424 Mass. 501, 677 N.E.2d 159 (1997).  Under this standard, capacity
defenses are not relevant absent adequate disclosure.  Salzwedel, *Corporate
Opportunity*, 23 Pace L. Rev. at 115-16.

contractual requirement that its Dealers present smoke curtain opportunities to
Curtain; (6) its creation of registered and unregistered trademarks for the sale of
smoke curtains;[21] (7) its payment of insurance for installment of smoke curtains
and, unwittingly, for Services' installation of smoke curtains; (8) its sale of smoke
curtains; (9) the conflicting justifications offered by Sadeghian for his diversion of
this opportunity; and (10) Defendants' non-disclosure of the opportunity to Curtain
before taking it for themselves.

Applying the disclosure standard, Sadeghian's non-disclosure is evident not
only from the record, but also from the evolving and inconsistent justifications he
has offered for his conduct—first, Curtain's alleged lack of necessary insurance;
then, an Addendum to Curtain's own Distribution Agreement; then, the SDA; and
finally, an unwritten distribution agreement between CYSA and BLE from early
2009. The short, and dispositive, response to each of these claims lies again in the
COA signed by Sadeghian (on behalf of Plaintiff member CYSA) identifying
smoke curtains as falling within the business of "U.S. Smoke & Fire Curtain,
LLC." Moreover, the fact that Sadeghian was able to garner these contractual
rights for Services, and then secretly have Curtain pay the insurance costs for

---

[21]     Curtain's registered Elevator Shield and unregistered Atrium Shield
trademarks involve smoke curtain installations. JA475¶71.

Services to exploit these opportunities, demonstrates that this was an opportunity that fell within Plaintiff's business purposes.

### E.     Defendants Did Not Disclose to Plaintiff, Nor Obtain its Consent for the Business Opportunity for BLE Products They Took For Themselves.

There is no evidence in this record that Sadeghian either disclosed the SDA to Curtain, or secured Curtain's consent to his signing it.  The only record evidence is that he did not disclose it to Curtain, OSS, or Christ.   *See, e.g.*, *Today Homes*, 272 Va. at 472 ("officer's desire to take an opportunity as his own, puts him on notice of his fiduciary duty to disclose the opportunity to the corporation before acting upon it for his personal benefit.").

Defendants have admitted that the SDA was "only communicated between Sadeghian and BLE; to Defendants' knowledge no other party was given the agreement, excluding the production in this case**."** JA777 **(**Defendants' Interrogatory Answer 3**).** "Sadeghian did not disclose to Curtain, OSS or [Mr. Christ] that he was signing the Services Distribution Agreement in advance of his executing it." JA361¶ 5. While Defendants purported to dispute this material fact (JA626¶5), the proof they offer (JA627-82; JA685-710) does not evidence any

disclosure of the SDA to Curtain whatsoever,[22] and is contradicted by their own interrogatory answer.

Plaintiff's material fact ¶ 7 asserting that neither CYSA nor Sadeghian "tendered the business opportunity contained in the Services Distribution Agreement to Curtain" (JA361¶7),was not disputed by Defendants other than a denial that this was a business opportunity of Curtain.. JA626¶7. But an officer's "belief" that he has no obligation to tender an opportunity, "whether in good faith or bad, cannot negate the clear fiduciary duty to disclose a corporate opportunity before taking it for himself." *Today Homes*, 272 Va. at 472.[23]

Sadeghian's fiduciary obligation pre-dated the COA, and was in effect during the formative phase of the joint venture.   *See Arent v. Bray*, 371 F.2d 571, 573 (4th Cir. 1967) (promoter is fiduciary to those whom subscribe); *Meinhard v. Salmon*, 249 N.Y. 458, 463-4, 164 N.E. 545 (1928) (Cardozo, J.) (joint venturers owe one another fiduciary duty) (followed by *Pollard & Bagby, Inc. v. Morton G. Thalhimer, Inc.*, 169 Va. 529, 534, 194 S.E. 701, 702 (1938)).  A joint venturer's fiduciary duty begins "with the opening of negotiations for the formation of the

---

[22]     Even Sadeghian's summary judgment declarations fail to allege that he disclosed the SDA to Curtain, Christ, or OSS.  JA276-81, 659-63.

[23]     A joint venturer must "make full and frank disclosure to the others of all facts within his knowledge that may affect the value of the others' interests." *Burruss v. Green Auction*, 228 Va. 6, 11, 319 S.E.2d 725, 727 (1984).

syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wou[n]d up and terminated." *Pollard*, 169 Va. at 534, 194 S.E. at 702). In Virginia, the fiduciary duties of joint venturers are those existing between partners. *Burruss,* 228 Va. at 10, 319 S.E.2d at 727.

### F.   Plaintiff is Capable of Selling Smoke and Fire Curtains.

Defendants contended that Plaintiff lacked the capacity to engage in the sale of smoke curtains. But Curtain has promoted BLE smoke curtains on its website from the outset, and has actually sold, BLE smoke curtains. JA465¶32, JA466¶34, JA469¶45, JA470¶50. Curtain's website contained a linked copy of the BLE smoke curtain technical manual, and this site was reviewed and approved by BLE, including the portions on BLE smoke curtains. JA470¶50.

More important, any claim that Sadeghian possessed unique skills regarding the sale of smoke curtains is no defense because Sadeghian's time and skills, and the financial resources of CYSA, were pledged under the COA to pursue smoke curtain business opportunities on behalf of Curtain. JA360¶11B (CYSA "willprovide additional financing for [Curtain] as required"). Because CYSA would later finance Services, Curtain had sufficient financial resources to exploit the opportunity to sell BLE products, including smoke curtains.

44

In breach of his obligations to Curtain, Sadeghian used not only his time and talents to develop the corporate competitor Services, he used other Curtain resources to do so, including secretly having Curtain pay for Services' insurance costs for installing smoke curtains. JA461¶7 & JA496-7. The use of corporate resources supports liability under the corporate opportunity doctrine. In *Today Homes*, the Virginia Supreme Court ruled that corporate officer Williams did not usurp her company's opportunity because she did *not* use any corporate resources to pursue the opportunity. 272 Va. at 274. *See In re Trim-Lean Meat Products*, 4 B.R. 243 (Bkr. Del. 1980) (where officer uses corporate assets to develop opportunity, it is a corporate business opportunity). The use of corporate resources to develop a business opportunity makes it a corporate opportunity, even it if falls outside of company's line of business. *In re Demert & Dougherty, Inc.*, 271 B.R. 821, 849 (Bkr. N.D. Ill. 2001). The three other reasons given for rejecting Williams' liability--she did not purchase the property using information gained during her employment, she had left her job when she purchased the property, and she had no intention of starting her own development company while still employed—also fall heavily against Sadeghian as he was Curtain's CEO "at all relevant times," the opportunity was based on information he gained while CEO, and Sadeghian admits (now) that he intended to start his own competing distribution company.

45

Defendants argue that Sadeghian was free to negotiate his own separate BLE Distribution Agreement for Services, and to use that Agreement to compete against Plaintiff. But this violates two separate fiduciary duties: (i) a corporate officer must devote his talents to securing business opportunities for his corporation, not for himself; and (ii) he cannot compete against his own corporation. *Williams,* 265 Va. at 289, 576 S.E.2d at 757. *See* Restatement of the Law Third, Employment Law § 8.04 comment e (Tent. Draft No. 4, April 11, 2011)("Corporate officers and other employees in positions of trust and confidence must disclose the opportunity to the employer and may pursue the opportunity only upon its rejection by the employer and only so long as it does not result in competition with the employer in violation of § 8.04.")

Sadeghian's claim that CYSA owns Curtain's intellectual property is itself a breach of his fiduciary duties, and a usurpation of Plaintiff's opportunities. *See, e.g., In re Access Cardiosystems, Inc.,* 340 B.R. 127 (Bkr. D. Mass. 2006). In *Access Cardiosystems,* the court held that an inventor and patent owner of an invention he used to start a company, breached his fiduciary duties and usurped the corporation's opportunity by later seeking to deprive the company of the intellectual property rights to the invention. *Id.* at 148-50. ("But [the inventor's] fiduciary duties toward [the company] began prior to incorporation, during the development of the intellectual property. The intellectual property clearly

46

represented an essential opportunity for the corporation, since [the corporation's]

sole purpose was to exploit the resulting inventions. ").[24] The court also held that

the promoter's failure previously to take steps to protect the company's intellectual

property rights separately violated his fiduciary duties to the company. *Id*. at 150.

Applied here, CYSA's claim of ownership of Curtain's trademarks,

including its domain name, constitute a similar breach of its, and Sadeghian's,

fiduciary duties to Curtain. Indeed, the District Court ruled, in its memorandum,

that CYSA had a conflict of interest in simultaneously purporting to represent

Curtain in this case, while "seeking to terminate or narrow the intellectual property

and contractual rights of Curtain." JA808. *Accord*, *Today Homes,* 272 Va. at 471,

634 S.E.2d at 743 (fiduciary duty forbids officer from placing himself in conflict)

Sadeghian was under a fiduciary duty "to refrain from doing anything that

would work injury to the corporation or deprive it of profit or advantage which his

skill and ability may properly bring to it." *Guth v. Loft, Inc*., 23 Del. Ch. 255, 270,

5 A.2d 503, 510 (Del. 1939). This duty forbid Sadeghian from setting up a

competing business (Services) to sell BLE products, including smoke and fire

curtains—and he admits he did precisely that.

---

[24]     The *Access Cardiogram* opinion quoted and followed *Demoulas v.
Demoulas Super. Mkts*., 424 Mass. 501 (1997), which in turn was quoted and
followed in *Today Homes,* 272 Va. at 472, 634 S.E.2d at 743.

G.     **The CDA Secures BLE Product Opportunities for Curtain,   And Even if It Did Not, Sadeghian Breached His Fiduciary Duties to Curtain by Allegedly Negotiating a Better Distribution Agreement for Himself.**

Defendants incorrectly assert that Curtain lacks the capacity to purchase BLE smoke curtains because they were excluded from the scope of the CDA.  This is incorrect as a matter of contract interpretation, but even if true, this would only prove that Sadeghian engaged in self-dealing in violation of his fiduciary duties to Curtain.

The CDA appointed Curtain as BLE's "exclusive distributor to import and distribute the Products in the Territory [United States]."  JA383§2.1.  The "Products" are defined by the Agreement to include smoke curtains.  Accordingly, smoke curtains are among the identified subjects of the agreement as reflected in its title, in its appointment provisions, and in its definition of the "Products" subject to the agreement.   In turn, Curtain agreed to use its "best efforts to promote and market the distribution and sale of the Products in the" United States.  JA384§4.1.1.  Curtain did so by, among other things, putting marketing information about the features of BLE smoke curtains on its website.

Notwithstanding this language, Defendants contend that section 2.2 of the CDA prohibits Curtain from purchasing smoke curtains from BLE, thereby

depriving Curtain of the "capacity" to purchase such curtains.   No such

prohibition exists.  Section 2.2 provides:

> *The Distributor [Curtain] shall purchase the Products [i.e., smoke and fire*
> *curtains] only from the Supplier [BLE] and shall not distribute or*
> *manufacture any Competing Product in the Territory [the United States].*
> The Distributor will have the exclusive right to sell the BLE fire curtain
> products for fire door, fire shutter, and fire door replacement applications.
> The Distributor will have non-exclusive sales and installation rights for all
> other fire curtain applications, and all other associated BLE products.

JA3835§2.2 (emphasis added).

The District Court construed the last two sentences as giving Curtain certain

exclusive and non-exclusive rights as to fire curtains.  JA797.  But then the Court

concluded—without any textual explanation--that "the distribution agreement did

not give Curtain the right to sell or distribute BLE smoke curtain products." *Id.*[25]

From this textually unsupported conclusion, the District Court accepted the

Defendant's next argument that, because Curtain allegedly lacked distribution

rights to BLE smoke curtains, no conflict existed between the distribution rights  of

Curtain (fire curtains) and of Services (smoke curtains), resulting in an absence of

competition between them. *Id*.

But even this misinterpretation of Curtain's distribution rights as limited to

fire curtains, does not avoid the glaring resulting conflict—both Curtain and

---

[25]    At his deposition, Sadeghian claimed that the prohibition on Curtain
purchasing smoke curtains from BLE was located in Curtain's contracts with its
network of dealers, and not in Curtain's Distribution Agreement with BLE.
JA528.

Services are given dueling contractual rights to distribute BLE fire curtains. Even under the District Court's narrow interpretation of Curtain's distribution rights, Sadeghian had placed his companies in direct competition with Curtain as to fire curtains. Because Curtain was the first in time with BLE fire curtain distribution rights, Sadeghian could not thereafter garner these rights for himself without making disclosure and obtaining Curtain's consent.

As for smoke curtains, neither section 2.2, nor any section of the CDA, expressly or implicitly excludes Curtain from distribution rights for BLE smoke curtains. JA383. To the contrary:

(i)     the first (italicized) sentence of section 2.2. confirms that Curtain "*shall* purchase the Products only from" BLE(JA383)(emphasis added);

(ii)    section 2.1 appoints Curtain to be the exclusive distributor of the "Products" in the United States (*id*.);

(iii)   section 5.1 further confirms that BLE "*shall* supply the Products to the Distributor [Curtain] for resale in the territory(JA386)(emphasis added);" and

(iv)    each such section includes smoke curtains within the definition of the "Products" discussed. (JA382, 403).

In *Medline,* for example, the court held that, where a distribution agreement defined the covered products as being listed in an attached Annex A, this constituted an unambiguous grant of distribution rights for the enumerated products in the attached list. 2004 WL 422718, at *8 (applying English law, "the language defining Products in Article 2 is clear, and thus must be given its plain and ordinary meaning").

To construe the fire curtain language of section 2.2. as eliminating the repeated, and mutually reinforcing contractual obligations of BLE exclusively to supply, and Curtain exclusively to purchase, the "Products" listed on Schedule 2including "smoke curtains"-- runs afoul of several plain language contract interpretation principles. These include that: (1) "[w]here possible, meaning must be given to every clause;"[26] (2) "every part of the contract must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other,[27] such that no word is superfluous;[28] (3) parties are presumed not to include a provision without any effect;[29] (4) courts "cannot read into contracts language which will add to or take away from the meaning of the words already

---

[26]    *Berry*, 225 Va. at 208, 300 S.E.2d at 796.

[27]    *Hughes & Co. v. Robinson Corp.*, 211 Va. 4, 7, 175 S.E.2d 413, 415 (1970).

[28]    *American Health Ins. v. Newcomb*, 197 Va. 836, 843, 91 S.E.2d 447, 451 (1956).

[29]    *Hughes*, 211 Va. at 7, 175 S.E.2d at 415.

contained therein;"[30] and (5) words of exclusion not included in a contract cannot be read into it by a court.[31] In short, the "'law will not insert by construction, for the benefit of a party, an exception or condition which the parties omitted from their contract, by design or neglect.'" *Bridgestone/Firestone, Inc. v. Prince William Square Associates*, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995).[32]

Defendants have also claimed an exclusion for smoke curtains based upon the CDA language defining Products as the Products described in Schedule 2 "*together with any other products developed from time to time by the Supplier and which the Supplier may expressly permit the Distributor in writing to distribute in the Territory*." JA382 (emphasis added). Seizing on the italicized language, Defendants argue that even the Products listed in Schedule 2 require some sort of additional express written authorization from BLE. *Id.* But the contract definition of "Product" distinguishes between the existing products listed in Schedule 2 (which includes smoke curtains) and those "*other products*" that may later be developed by BLE for which BLE reserved the right to negotiate

---

[30]    *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984).

[31]    *Westbury Coal Mining P. v. JS&K Coal*, 233 Va. 226, 229, 355 S.E.2d 571 (1987) (quoting *Montague Mfg. Co. v. Homes Corp.*, 142 Va. 301, 311-12, 128 S.E. 447 (1925)).

[32]    Like Virginia, English law also construes contracts in accordance with their plain meaning. *Peabody Holding Co. v. Costain Group,* 813 F. Supp.1402, 1416 (E.D. Mo. 1993); *In re McMahon*, 236 B.R. at 305; *Chartbrook Ltd v. Persimmon Homes Ltd*, 2009 UKHL 38, ¶¶ 38 & 39.

distribution rights in the future.  But BLE did not do so as to the existing

"Products" in Schedule 2 for which Schedule 2 constituted the written agreement

expressly permitting distribution rights for Curtain. JA 382, 403[33]

    Although evidence of the parties' intent and conduct cannot be used to

construe an unambiguous contract,[34] Plaintiff placed in the record evidence that

Curtain marketed and had purchased smoke curtains from BLE, thereby creating

disputed issues of fact if such evidence were admissible.  JA461¶6, JA470¶48,

JA472¶56.   Indeed, BLE issued a quote to Curtain for the resale of an SD-60

smoke curtain on August 28, 2009—the day that Sadeghian signed the CDA.

JA469¶45 & JA493-5.  Because of Curtain's prior, exclusive, appointment from

BLE for the resale of BLE "Products" in the United States, neither Sadeghian nor

BLE, were free subsequently to give an identical appointment to Services for the

same business opportunity.

    Finally, Defendants' position is based upon the false legal premise that a

company must first secure a written contract for a business opportunity before it

---

[33]    Nor, for that matter, can the parole terms of the SDA be used to contradict the unambiguous terms of the CDA.  *Money Point, supra*; *Anden Group, supra.*

[34]    *See, e.g., Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624-25 (4th Cir. 1999) (citing *Berry*); *Peoples Bank,* 148 Va. at 657, 139 S.E. at 327. The same is the case under English law. *In re McMahon*, 236 B.R. at 305 (quoting Chitty on Contracts*,* ¶12-104, "'Nor is evidence admissible as to 'the parties' subjective intentions with respect to the words used.'").

can insist that its fiduciaries not divert it to themselves.  But in *Today Homes*, a

corporate officer who entered into a contract with a third party for a business

opportunity was held liable, notwithstanding the fact that his original employer had

no contractual relations with the third party.

Here, the facts are even more compelling, because Curtain had existing

contractual relations, and business expectancies with the third party--BLE.

Sadeghian's fiduciary obligation to Curtain precluded him from entering into a

subsequent agreement with BLE for his own benefit, especially one that he

considered more favorable than the prior CDA.  Hence, even if the SDA secured

greater distribution rights for Services than those possessed by Curtain, that would

itself be a breach of Sadeghian's fiduciary duties to Curtain absent evidence—not

present here—that he disclosed the opportunity to Curtain and obtained Curtain's

consent to pursue it on his own.

### H.    The District Court Erred in Failing to Credit Plaintiff's Evidence.

The District Court failed to credit Plaintiff's evidence, including the COA

signed by CYSA and Sadeghian, contradicting Defendants' contention that BLE

smoke curtains were excluded from Plaintiff's business purpose.  This was error.

*In re French*, 499 F.3d at 352.

The District Court, for example, failed to credit Plaintiff's showing that, in

2009, Sadeghian concealed from Plaintiff his alleged separate negotiations with

54

BLE for distribution rights for Services, and that neither OSS nor Christ consented to any such negotiations. Likewise, the District Court failed to credit the CDA language favoring Plaintiff, and Plaintiff's showing regarding its marketing and sales of BLE products.

The District Court also misinterpreted a Curtain Dealer Status Report of October 28, 2009 as a recognition by Christ that Plaintiff could not sell smoke curtains. JA798-9. The pertinent Report confirmed that Plaintiff's dealers were told that "smoke curtains are not part of their Agreement, *but that we are open to working with them on a case-by case basis.*" *Id.* (emphasis added). Christ, who was responsible for drafting the dealer agreements, explained:

> The [Report] reference to 'working with dealers' on smoke curtains refers to the fact that the applications most commonly associated with the use of smoke curtains (i.e., atriums), are typically listed as exclusions under the Dealer Agreements, meaning that dealers can undertake such applications only with Curtain's prior consent. This also confirms that such opportunities belong to Curtain. . . .. For its own business purposes, and for the sole and exclusive benefit of Curtain, Curtain chose to retain certain rights as a matter of its discretion by defining certain exclusions for custom solutions. . . … The objective of the exclusions is to provide for custom projects that would benefit Curtain, certainly not to reserve opportunities for competitors, or for Services.

JA468¶42.

In other words, the Dealer Agreements were obligated to tender smoke curtain opportunities *to Curtain* first for its development. The fact that Curtain instructed its dealers to bring smoke curtain opportunities to Curtain flatly

contradicts Defendants' contention that such opportunities fell outside of Curtain's business. This also confirms that BLE was aware in October 2009 of Plaintiff's instructions to its dealers to bring smoke curtain opportunities to Curtain for its development, contrary to Defendants' parol contention that BLE had previously reserved such rights to CYSA or Services.

## I.     The District Court Erred in Invalidating Plaintiff's Intellectual Property Rights.

The District Court dismissed Curtain's intellectual property claims for lack of standing by Curtain, because the marks were allegedly licensed both to "Services and Curtain as sister companies," and because Curtain's registered trademark was invalid, and a trademark application was descriptive. Initially, these conclusions suffer from the same legal error—a failure to address the fiduciary duties owed by Sadeghian and CYSA to secure intellectual property rights for the joint venture and subsequently for the limited liability corporation. *Access Cardiosystems,* 340 B.R. at 148-50. Had the Court considered the applicable fiduciary obligations of Sadeghian, it could not have reached its intellectual property conclusions, especially without resort to a jury to determine the numerous disputed issues of material fact.

### 1. Curtain Has A Valid Registered Elevator Shield Trademark.

Curtain owns a registered trademark for a smoke curtain application—
"Elevator Shield." U.S. Reg. No. 3,897,681 (JA926). Registered trademarks are
presumed valid. *Walmart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S.205, 209
(2000). This Court has held that ownership of a registered trademark establishes a
prima facie case for purposes of overcoming a motion for summary judgment.
*AOL, Inc. v. AT&T Corp.*, 243 F.3d 812, 818 (4th Cir. 2001). Despite this, the
District Court dismissed Curtain's trademark infringement claim on the ground
that Curtain lacked standing to invoke the claim because: (1) it did not "coin" the
term; (2) the alleged infringer and conflicted officer, Sadeghian did not approve
Curtain's registration application for the mark, and allegedly was the first to use
the mark; and (3) the mark was not approved by BLE. JA801. Initially, Plaintiff
presented evidence that that the term "Elevator Shield" was developed by Christ in
consultation with Sadeghian, and [Curtain staff] Linda Garzone "on behalf of
Curtain, Curtain was the first to use this term," and "it was not used by either
CYSA or Service[s] prior to Curtain's trademark application." JA464¶21,
JA476¶84. "Curtain was the first to use Elevator Shield in commerce, and has
done so through the installation or sale of dozens of products." *Id.* These issues
are, at best, disputed.

Second, CEO Sadeghian labored under fiduciary duties to Curtain in April 2010 when Curtain applied for the registered trademark, and as a competitor he thus was conflicted from  opposing Curtain's application to register the mark Corporate officers with direct conflicting interests are barred from acting or voting on such matters. *Crump v. Bronson*, 168 Va. 528, 537, 191 S.E.663, 667(1937); *Marcuse v. Broad-Grace Arcade Corp.*, 164 Va. 553, 571, 180 S.E. 327, 334 (1935).  In short, Sadeghian's approval was immaterial, because he could not act upon a matter (whether to register a Curtain mark) as to which he had a direct conflict.  The District Court itself recognized, and acted upon, that direct conflict, by ruling that CYSA was conflicted from representing Curtain in this litigation. JA805-06.

The District Court's ruling that the registered trademark is invalid because it allegedly ran afoul of CDA language allegedly giving BLE rights over future trademarks is also incorrect.  The only source for the contention that BLE did not approve of Curtain marks, is a declaration from conflicted officer Sadeghian. JA545¶17. No such claim has been made by BLE or its employees.  First, Defendants lack standing to invoke BLE's alleged contractual rights under the CDA, both as a matter of contract law, *Food Lion v. Nusbaum Ins. Agency*, 202 F.3d 223, 229 (4th Cir. 2000) (only intended beneficiaries may enforce contracts ), and under the terms of the CDA.  JA398¶22.  Furthermore, BLE has limited the

58

CDA parties' rights to raise trademark issues to international arbitration. JA394¶15.3.

But even on the merits, the CDA does not prohibit Plaintiff from registering its own trademarks. To the contrary, the CDA defines and limits the "Trademarks" to which the CDA applies to two BLE trademarks in the U.K., JA382¶1.1. ("Trade Marks" definition, citing Schedule 4), neither of which are involved in this case. The CDA gives BLE the right to designate further trademarks "which the supplier [BLE] may use now or in the future designate for use in the Territory with respect to the Products." *Id.* BLE never exercised its discretion to make any trademark designations during the life of the CDA. JA474¶65.

## 2.    Curtain Has Standing To Claim Its Marks.

The District Court ruled that Curtain lacked ownership of its domain name, and the corresponding logo for which it made a trademark registration application. Plaintiff presented evidence that the domain name was created by Christ for marketing, branding, and search engine optimization purposes, and it was selected for use in the joint venture. JA465-6¶¶29, 32, 33. Sadeghian did not coin the term. *Id.* ¶ 29.

The Court considered CYSA's act of registering on the internet for Curtain's domain name (ussmokeandfirecurtain.com) constituted "prior use" by CYSA.

59

This incorrectly assumes that this internet registration by CYSA was not done as part of the formative steps of the joint venture. The fact that CYSA "paid for the registration of" Curtain's website is consistent with the evidence that CYSA had agreed to finance the start up costs for the joint venture, and had agreed in the COA to provide "additional financing" to Curtain's business. The District Court's "prior use" analysis focuses on the wrong issue—prior use is determined not by mere registration, but rather is fixed by actual use in commerce. *American Online Latino v. AOL, Inc.*, 250 F. Supp.2d 351, 359-60 (S.D.N.Y. 2011) (ownership of mark in domain comes from its use in commerce). It is undisputed on this record that the first website launched by Services was not until April 2010, over a year after the creation and continued use of Curtain's website to market both smoke and fire curtains. JA463¶18. In short, CYSA "has not used Curtain's trademarks in commerce—Curtain has." JA463¶17.

The District Court did not explain the basis for its conclusion that Curtain's trademarks "were licensed to Services and Curtain as sister companies." JA798. The only "licensing agreement" of which Appellant is aware, is one signed by Sadeghian in 2011 purporting retroactively to license CYSA's intellectual property to Curtain, on a "*nunc pro tunc*" basis, back to early 2009. Defendants did not place this license in their summary judgment record. Their need for such a *nunc pro tunc* license merely confirms Curtain's prior use and Sadeghian's conflict.

60

### 3. Curtain's Trademark Application for Its Name Was Not Merely Descriptive.

The District Court concluded that Curtain's application for a trademark for "U.S. Smoke & Fire Curtain Life Safety, Accessibility, Design Freedom" was merely descriptive and thus invalid. The District Court accepted Defendants' disputed claim, drawn from a series of exchanges from the Trademark Attorney assigned to the application, that this mark was not registrable because it was merely descriptive and allegedly had been finally rejected by the U.S. Patent and Trademark Office in August 2011. JA794. But, the Patent and Trademark Office did register this as a valid Curtain trademark on March 6, 2012. U.S. No. 4,107,234 (JA926).[35] This Court has held that the registration of a trademark is prima facie evidence that a mark is not merely descriptive. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528-29 (4th Cir. 1984). In registering the mark, the PTO gave prima facie validity to Curtain's trademark claim. *Id.*

### I. In Any Event, the District Court Erred in Granting Summary Judgment When It Found that the Moving Party Had an Actual Unwaivable Conflict of Interest.

The District Court found that CYSA had an unwaivable conflict of interest because CYSA "is pursuing legal interests in its counterclaims that are antagonistic to those of Curtain, whom Defendants are simultaneously purporting to represent

---

[35] Courts take judicial notice of USPTO registrations. *Island Software and Co. Service v. Microsoft*, 413 F.3d 257, 261 (2d Cir. 2005).

under its counterclaims." JA806 (citing Va. Rule Prof. Conduct 1.7, and noting that this conflict is unwaivable under Rule 1.7(b)(3)).    The Court ruled that CYSA could not represent Curtain in this case because "CYSA is seeking summary judgment against Curtain's intellectual and contractual rights in this same case." *Id.*

Having found an actual, unwaivable conflict of interest by CYSA and its counsel for seeking summary judgment against Curtain's legal interests, the District Court nonetheless went forward to grant their summary judgment motion. Rather than complete the breach of duty by CYSA, Sadeghian, and their defense counsel by granting summary judgment, the District Court should have first addressed the consequences of the conflict.  Once again, Sadeghian had failed his fiduciary duty to avoid a conflict in interest with Curtain.  "The weight of authority throughout the nation is clear, courts have an independent power and duty to root out unethical practices and may disqualify attorneys from representation to prevent ethical violations, regardless of the wishes of the parties." *Lamson & Sessions Co. v. Mundinger*, 2009 WL 1183217, *3 (N.D. Ohio May 1, 2009) (citing cases). Particularly here, where defendant Sadeghian labored under a conflict of interest with respect to Curtain's rights, he should not be permitted to violate his duties of loyalty to Curtain by seeking summary judgment against Curtain's legal rights through CYSA and his personal counsel.

## CONCLUSION

For the foregoing reasons, the grant of summary judgment should be reversed, and the case remanded for further proceedings.

Respectfully submitted,

_____
Terrance G. Reed
Robert Moir
Lankford & Reed PLLC
120 North St. Asaph St.
Alexandria, VA 22314
(ph): 703-299-5000
(fax): 703-299-8876
tgreed@lrfirm.net
rkmoir@lrfirm.net

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on that on June 11, 2012, I electronically filed with the

Clerk's Office of the United States Court of Appeals for the Fourth Circuit this

brief and further certify that the parties' counsel will be notified of, and receive this

filing through the Notice of Docket Activity generated by this electronic filing.

___/s/_____
Terrance G. Reed

Lankford & Reed PLLC
120 N. St. Asaph St.
Alexandria, VA  22314
Ph: (703) 299-5000
Fax: (703) 299-8876
TGReed@lrfirm.net

Attorney for the Appellant

Dated: June 11, 2012
            Alexandria, VA

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. <u>11-2157</u>       **Caption:** <u>OSS, Inc. on behalf of US Smoke & Fire Curtain v Sade</u>

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑        this brief contains ____13,983____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐        this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑        this brief has been prepared in a proportionally spaced typeface using
<u>Microsoft Office Word 2010</u> [*identify word processing program*] in
<u>Times New Roman 14</u> [*identify font size and type style*]; **or**

☐        this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

<u>(s)</u> Terrance G. Reed

Attorney for <u>Appellant</u>

Dated: <u>06/11/12</u>